IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH ALEXANDER,

       Plaintiff,

  v.

NATIONWIDE LIFE INSURANCE COMPANY,

       Defendant.

_____/

No. C 09-1677 CW

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Docket No. 21)

Plaintiff Elizabeth Alexander charges Defendant Nationwide Life Insurance Company with unlawful employment practices and related torts.  Defendant moves for summary judgment on Plaintiff's claims.  Plaintiff opposes the motion only with respect to her claims for disability discrimination and failure to accommodate her disability.  The motion was heard on August 5, 2010.  Having considered oral argument and the papers submitted by the parties, the Court GRANTS in part Defendant's Motion for Summary Judgment and DENIES it in part.

BACKGROUND

Plaintiff was an employee of Defendant or its predecessor from 1985 until the termination of her employment on February 9, 2007. When Defendant discharged her, she held the position of Program Director.  In that role, she supervised a team of employees who marketed Defendant's products throughout Northern California.

At the age of eighteen, Plaintiff was diagnosed with bipolar disorder.  During her career with Defendant, Plaintiff experienced at least five manic episodes, resulting from the disorder. According to the American Psychiatric Association, a manic episode "is defined by a distinct period during which there is an abnormally and persistently elevated, expansive, or irritable mood."  Pl.'s Request for Judicial Notice (RJN),[1] Ex. 1 at 357.

In 1994 and 1999, Plaintiff suffered manic episodes, for which she required hospitalization.  She took leave on both occasions. She states that, upon returning to work after each of these two episodes, she was not criticized for her condition or disciplined for her absence.

In early May, 2003, Plaintiff experienced another manic episode.  On or about May 6, 2003, she was found dancing and obstructing traffic on the Golden Gate Bridge.  The following day, she felt compelled to travel to Chicago to rescue her brother "from an imagined deadly peril."  Alexander Decl. ¶ 4.  Before leaving,

_____

[1] Plaintiff asks the Court to take judicial notice of the description of a manic episode contained in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV). Defendant does not oppose Plaintiff's request and the Court GRANTS it.  Fed. R. Evid. 201(b); see also United States v. Cantu, 12 F.3d 1506, 1512 (9th Cir. 1993) (relying on definition from the DSM-IV).

she asked Jim Laffoon, her assistant, to come to her home and retrieve work-related documents. After he arrived, Plaintiff told Laffoon that she "has been many people through time" and that she believed her supervisor, Robert Bilo, and another employee "were responsible for 9/11." Adams Decl., Ex. 3 at D000620. Based on this conversation, Laffoon believed that Plaintiff "needed some kind of help." Id., Ex. 2, Laffoon Depo. at 30:8-13. He recounted his encounter with Plaintiff to Bilo, who in turn informed the human resources department about her behavior.

Defendant responded by assembling an Incident Management Team (IMT). An IMT was a "multi-disciplinary team" comprised of employees from various departments, including the "office of general counsel" and "associate health services." Adams Decl., Ex. 4, Hill Depo. 30:5-7. IMTs were convened when employees threatened "harm to themselves or someone else." Id. at 32:7-9. Catherine Hill, a licensed social worker employed in Defendant's Employee Assistance Program, led the IMT handling Plaintiff's case. Throughout its work, the IMT updated Bilo on Plaintiff's status.

The IMT directed Bilo to place Plaintiff on paid leave. It also sought assistance from Crisis Management International (CMI), an organization that provided "corporate crisis intervention services." Id., Ex. 6, Lacovara Depo. 16:7-8. CMI assigned Dominick Lacovara, who had experience as a psychiatric social worker, to Plaintiff's case. Lacovara was charged with facilitating Plaintiff's treatment and evaluation.

Before returning to work, Plaintiff underwent a fitness-for-duty evaluation, which was completed by Dr. Jeffrey Gould, a psychiatrist. In a letter to Hill, Dr. Gould opined that Plaintiff

United States District Court
For the Northern District of California

would be able to return to her position if she was "able to comply with psychiatric medication treatment with a local psychiatrist." Id., Ex. 9 at 000372. He also stated,

> Signs of future impending relapse for Ms. Alexander could include bizarre behavior similar to that observed prior to her current leave of absence. Additional signs of relapse may include euphoric and irritable moods, talking rapidly, being easily distracted, having delusional thoughts, engaging in pleasurable activities that carry a high potential for painful consequences, or activities that are clearly dangerous.

Id. Bilo discussed Plaintiff's condition with Dr. Gould. See Adams Decl., Ex. 13 at D00564.

In June, 2003, with the assistance of Lacovara, Plaintiff entered the care of psychiatrist Dr. Alan Dubin and therapist Catherine Kamins. When she began her treatment with Dr. Dubin, she expressed her desire to have a child with her "soon-to-be husband," Ruel Cazar. Alexander Decl. ¶ 5. She stated her concern that Zyprexa, a drug she was then taking to stabilize her mood, could cause a health risk for an unborn child. Dr. Dubin "agreed that Zyprexa would pose such a health risk if [Plaintiff] became pregnant" and presented her with "an alternative course of treatment consisting of taking large daily doses of Omega 3 fatty acids while carefully and gradually tapering the daily dosages of Zyprexa down to zero, with the goal of then maintaining mood stability through continued large doses of Omega 3 fatty acids." Dubin Decl. ¶ 3. In his experience, such a regimen "proved reasonably effective with some patients." Id. Plaintiff accepted Dr. Dubin's treatment plan and, by the fall of 2003, she was "exclusively using Omega-3." Alexander Decl. ¶ 5. She states that, through her use of Omega-3 fatty acids, she "remained free of

4

any manic episodes for nearly three years . . . ."  Id. ¶ 6.

In 2006, Plaintiff suffered her next manic episode.  Sometime in June of that year, Bilo notified his program directors that there would be a two-day meeting in Sacramento, California.  At around the time Bilo posted notices about the meeting, he began to have concerns that Plaintiff was not taking her medication.  Before the event, Plaintiff contacted Bilo and asked to be excused from the meeting.  She complained of being "tired and stressed out" and expressed a desire to go to Big Sur to relax.  Lee Decl., Ex. 2, Bilo Depo. 125:18-20.  Bilo refused Plaintiff's request and required her to attend the meeting.

Upon arriving at the conference, Plaintiff exhibited unusual behavior, including "talking very loudly," "not staying on point" and expounding on "conspiracy theories" about Defendant's management.  Id. at 127:20-24.  Bilo believed Plaintiff was acting out of character.  After the meeting was convened, Plaintiff launched into a rant about Defendant's mistreatment of its employees.  At this point, Bilo adjourned the session.  He then spoke with Plaintiff individually and suggested that she take a break.  Thereafter, Plaintiff returned to her hotel room.

Plaintiff continued to exhibit odd behavior throughout the duration of the two-day meeting.  On the last day, Plaintiff did not attend the closing session.  Instead, she wandered through a local shopping center's parking lot, acting strangely.  Her behavior prompted a merchant to call the El Dorado County Sheriff's Department.  The responding deputy contacted Bilo and then committed Plaintiff to a mental health facility for observation.  She was released from the facility one day later.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Because of her behavior during the meeting, Bilo sought assistance from human resources.  Defendant again convened an IMT and retained Lacovara to work with Plaintiff.  She was placed on leave and directed to undergo another fitness-for-duty evaluation with Dr. Gould.

On July 25, 2006, Bilo had an hour-long phone call with Dr. Gould about Plaintiff.  Bilo then sent an email to Hill about the conversation, stating that he understood that Plaintiff's manic behavior would recur in the future and "the only remedy is prevention . . . because once it happens there is not much you can do."  Adams Decl., Ex. 13.  On July 26, 2006, in another email, Bilo expressed his discomfort with continuing to work with Plaintiff.  He stated that he understood that there were "major concerns about the legality of letting Elizabeth go," but that he wanted "to have a better understanding of our options as a company."  Id., Ex. 14.

On or about August 4, 2006, Dr. Gould issued his report on Plaintiff.  He believed that she had returned "to her baseline functioning" and that she could return to work so long as she adhered to a proper medication regimen.  Id., Ex. 15 at 000373.  He opined that an appropriate treatment plan required "antipsychotic, mood stabilizing, or benzodiazepine classes of medication and does not include alternative treatment regimens such as Omega-3 supplements in place of conventional psychiatric medication . . . ."  Id. at 000374 (emphasis in original).  He stated that, if Plaintiff took conventional medications, Defendant would not have "to make any accommodations for her employment."  Id.

6

United States District Court
For the Northern District of California

Plaintiff returned to the care of Dr. Dubin.  He followed the treatment plan he prescribed for her in 2003: Plaintiff took Zyprexa, which was gradually replaced with large doses of Omega-3 fatty acids.

On August 16, 2006, Plaintiff returned to work after being on leave for approximately six weeks.  Upon her return, Bilo presented Plaintiff with a One-Time Notice[2] for her "inappropriate conduct" at the Sacramento meeting.  It does not appear, however, that he informed her that she would have to adhere to Dr. Gould's recommendations for preventing manic episodes.  The One-Time Notice also warned her not to use her corporate American Express card to make personal purchases.  Lee Decl., Ex. F.  Plaintiff claims that, prior to receiving the One-Time Notice in August, 2006, Defendant had never "advised or counseled" her against making personal charges on her corporate credit card.  Alexander Decl. ¶ 7.  She asserts that she had been using her corporate credit card for personal charges since 1999, but that she reimbursed Defendant for these purchases.  She maintains that, had Defendant warned her sooner, she "would have willingly stopped charging personal expenses on the card . . . ."  Id.

Plaintiff's final manic episode while employed with Defendant began in January, 2007.  Sometime in mid-January, while on layovers during her return from a business trip to Columbus, Ohio, she made personal charges on her corporate credit card and phoned a former administrator of Defendant to accuse him of "controlling the

---

[2] "A one-time notice is a written document that identifies . . . unacceptable conduct and briefly describes the conduct that occurred."  Lee Decl., Ex. G.

weather." Alexander Decl. ¶ 8.  On January 22, Plaintiff learned from a home pregnancy test that she could be pregnant, knowledge that she claims worsened her manic state.

On the morning of January 23, Plaintiff went to the hospital to confirm her pregnancy.  She missed a conference call that she was to have with Bilo.  That afternoon, she contacted Sheilah Toothill, Bilo's assistant, to inform her that she was traveling to London "to unwind."  Id. ¶ 9.  Thereafter, Plaintiff sent a two-and-a-half page, single-spaced email to Bilo and other administrators, which began by addressing training for a new employee.  However, the email devolved into a rambling, incoherent discussion about work and personal issues.  That evening, Plaintiff left for London.

On January 24, Plaintiff left a voicemail with Bilo's office, providing her contact information in London and indicating that she would return on January 29.  She also stated that she was having difficulty using her mobile phone.  Sometime that same day, Bilo contacted Julie Hoover, a human resources employee, and stated, "I want to let [Plaintiff] go."  Adams Decl., Ex. 20.  At or around that time, Defendant convened an IMT.  Bilo was a member of the IMT.

In the early morning hours of January 26, Plaintiff reportedly ran naked through the halls of her hotel, "knocking on doors and upsetting other patrons."  Alexander Decl., Ex. 2.  Police then found Plaintiff walking naked in the street.  At around 3:00 a.m., she was involuntarily committed to a mental health ward at a London hospital.

On January 29, Plaintiff sent a note to hospital personnel,

indicating her desire to return to the United States.  At around noon that day, Bilo left a message on Plaintiff's mobile phone, stating that she had been placed on paid leave.  He sent her an email indicating the same.  That afternoon, Lacovara, whom Defendant had again retained to handle Plaintiff's case, spoke with Cazar, who was by then Plaintiff's husband.  Cazar indicated that Plaintiff would return to the United States within the week, but stated that he did not have specific details.  After speaking with Lacovara, Cazar left a voicemail for Bilo, stating that Plaintiff was in London with medical complications from her pregnancy.

On January 30, Cazar contacted Toothill and informed her that Plaintiff had not returned as expected on January 29 because of a problem with her flight, but that she would return sometime that week.  He also stated that she was suffering pregnancy-related complications.  Toothill told Cazar that Plaintiff had been placed on paid leave.  Cazar subsequently called Plaintiff to inform her that Defendant had placed her on leave.  That same day, the IMT decided to check the charges made to Plaintiff's corporate credit card.

On February 1, Lacovara spoke to Cazar.  Cazar reiterated that Plaintiff would return to the United States within the week, but indicated that "there was no way [Plaintiff] can be contacted directly."  Adams Decl., Ex. 7 at 69.  He reassured Lacovara that Plaintiff was safe.

On or about February 7, the IMT decided to terminate Plaintiff's employment.  A review of Plaintiff's corporate credit card records revealed that she had charged $12,000 for personal purchases during that billing cycle.  Hoover sent Plaintiff a

United States District Court
For the Northern District of California

letter, notifying her that, as of February 9, 2007, her employment was terminated "due to job abandonment and a violation of the One-Time Notice (August 16th 2006) including the use of your Corporate American Express for personal expenses."  Adams Decl., Ex. 23.

On February 11, Plaintiff was discharged from the London hospital and, thereafter, returned to the United States.

On or about July 16, 2007, she filed a charge of discrimination with the California Department of Fair Employment and Housing (DFEH), alleging that she had been subjected to differential treatment and discharged on the basis of her sex and disability.

Plaintiff's complaint pleads seven causes of action: (1) a claim under the California Fair Employment and Housing Act (FEHA) for sex discrimination; (2) a FEHA claim for retaliation; (3) a FEHA claim for disability discrimination; (4) a FEHA claim for a failure to accommodate her disability; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; and (7) a claim under California Labor Code § 206 for a failure to pay wages due.  In her opposition to Defendant's motion for summary judgment, Plaintiff states that she withdraws her claims for sex discrimination, retaliation, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of California Labor Code § 206.  Accordingly, the Court grants summary judgment against her on these claims.  Only her claims for disability discrimination and a failure to accommodate her disability are considered below.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and

10

disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d

United States District Court
For the Northern District of California

1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

DISCUSSION

I.   Disability Discrimination

A.   Applicable Law

In disparate treatment cases, plaintiffs can prove intentional

12

discrimination through direct or indirect evidence. "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (citation and internal quotation and editing marks omitted).

Because direct proof of intentional discrimination is rare, such claims may be proved circumstantially. Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000). To do so, plaintiffs must satisfy the burden-shifting analysis set out by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Guz, 24 Cal. 4th at 354. The McDonnell Douglas burden-shifting framework is used when analyzing disability discrimination claims under FEHA. Id.; see also Brundage v. Hahn, 57 Cal. App. 4th 228, 236 (1997).

The Ninth Circuit has instructed that district courts must be cautious in granting summary judgment for employers on discrimination claims. See Lam v. Univ. of Hawai'i, 40 F.3d 1551, 1564 (9th Cir. 1994) ("'We require very little evidence to survive summary judgment' in a discrimination case, 'because the ultimate question is one that can only be resolved through a "searching inquiry" -- one that is most appropriately conducted by the factfinder.'") (quoting Sischo-Nownejad v. Merced Cmty. Coll. Dist., 934 F.2d 1104, 1111 (9th Cir. 1991)).

B.   Prima Facie Case

Within the McDonnell Douglas framework, plaintiffs may establish a prima facie case of disability discrimination by showing that: (1) they had a disability, (2) they were qualified

United States District Court
For the Northern District of California

individuals and (3) they were subjected to an adverse employment action because of their disability. Brundage, 57 Cal. App. 4th at 236. The burden at the prima facie stage is minimal. Caldwell v. Paramount Unified Sch. Dist., 41 Cal. App. 4th 189, 197 (1995).

Defendant acknowledges that Plaintiff has bipolar disorder, a recognized mental disability. See Brundage, 57 Cal. App. 4th at 236. It contends, however, that Plaintiff fails to satisfy her prima facie burden because she was not a qualified individual and that, even if she were, she fails to provide evidence that adverse actions were taken against her because of her disability.

1.   Qualified Individual

California's proscription against disability discrimination applies only to "those employees with a disability who can perform the essential duties of the employment position with reasonable accommodation." Green v. State, 42 Cal. 4th 254, 264 (2007); Cal. Gov. Code § 12940(a)(1). "Therefore, in order to establish that a defendant employer has discriminated on the basis of disability in violation of the FEHA, the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation." Green, 42 Cal. 4th at 262. Because California and federal employment discrimination laws are similar, federal cases are instructive. Guz, 24 Cal. 4th at 354.

Plaintiff contends that she could perform the essential duties of her position as long as she was accommodated with medical leave after she suffered manic episodes. She proffers testimony from Bilo, who stated that she was a "solid pro" and had more positive than negative evaluations. Adams Decl., Ex. 1, Bilo Depo. 99:13-100:8. She also points to Laffoon's testimony that he enjoyed

14

United States District Court
For the Northern District of California

working with her and that she was "[c]omplete, focused, directed, well-organized." Id., Ex. 2, Laffoon Depo. 93:6-7.  The record also contains evidence that, after taking each medical leave for her disability, she would return to work; Defendant does not contend that Plaintiff was not able to perform her job's essential duties upon returning from these leaves.  Based on this evidence, Plaintiff satisfies her prima facie burden to show that she was a qualified individual.

Defendant argues that Plaintiff cannot be considered a qualified individual because she did not take Zyprexa as recommended by Dr. Gould.  It cites Siefken v. Village of Arlington Heights, in which the plaintiff, a police officer, was fired after he experienced a diabetic reaction that caused him to drive erratically while on duty.  65 F.3d 664, 665 (7th Cir. 1995).  The Seventh Circuit upheld the district court's dismissal of his discrimination claim under the Americans with Disabilities Act (ADA).  The court reasoned that, because the plaintiff failed to "monitor his medical condition sufficiently to allow him to perform the duties of a patrol officer," his discharge did not violate the ADA.  Id. at 666.  Further, the plaintiff did not ask his employer to accommodate his diabetes before or after the incident; instead he sought a "second chance," which the court explained did not constitute an accommodation under the ADA.  Id.

Siefken is distinguishable on the facts.  Here, there is no evidence that Plaintiff was informed of Dr. Gould's advice for treating her bipolar disorder or that Defendant instructed her to follow his advice as a condition of her employment.  Instead, Plaintiff followed the medication regimen prescribed by Dr. Dubin,

15

which called for Plaintiff gradually to replace her intake of Zyprexa with Omega-3 fatty acids.  As noted above, Plaintiff wanted to become pregnant, and Dr. Dubin adjusted his treatment as a result.  Dr. Dubin contends that, in his experience, treating bipolar patients with Omega-3 fatty acids "proved reasonably effective."  Dubin Decl. ¶ 3.  Defendant does not offer evidence that Dr. Dubin's treatment plan was so objectively inadequate that Plaintiff's decision to follow it amounted to a failure to monitor her bipolar disorder.  Defendant's disagreement with Dr. Dubin's prescription does not, as a matter of law, render Plaintiff an unqualified individual.  This is a question of fact for a jury. See Dark v. Curry County, 451 F.3d 1078, 1088 (9th Cir. 2006) (concluding that dispute between employer's and employee's physicians regarding employee's fitness for duty raised a genuine issue of material fact as to employee's qualifications).  Also, unlike Siefken, Plaintiff did not merely seek a "second chance;" she maintains that Defendant should have afforded her leave as an accommodation.

Further, the Ninth Circuit has expressed disapproval of Siefken.  In Dark, an employee knew that an epileptic seizure could be imminent, but nevertheless drove his employer's pickup truck. 451 F.3d at 1081.  The employee suffered a seizure while operating the truck, requiring a passenger to take control of the vehicle to bring it to a stop.  Id.  His employer subsequently discharged him for being unable to perform the essential functions and duties of his position and engaging in misconduct that threatened public safety.  Id.  The Ninth Circuit reversed the district court's grant of summary judgment, concluding that the employee was entitled to a

United States District Court
For the Northern District of California

trial on his disability discrimination claim under the ADA.  Id. at 1091.

There, as here, the defendant cited Siefken to argue that an employer does not violate the anti-discrimination laws when it fires an employee who "does not control his disability and fails to meet the employer's legitimate job expectations."  451 F.3d at 1090 n.9.  The Ninth Circuit distinguished Siefken on the facts, concluding that Dark sought an accommodation that would have changed "the ordinary terms and conditions of his work," in contrast to Siefken who asked only for a "'second chance' to change his own behavior."  Dark, 451 F.3d at 1090 n.9 (citing Siefken, 65 F.3d at 666-67).  The Ninth Circuit also added that its prior precedent "demonstrates that our court has not taken an approach as unforgiving as that exhibited" by the Seventh Circuit in Siefken. Dark, 451 F.3d at 1090 n.9 (citing Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1245-47 (9th Cir. 1999) and Humphrey v. Memorial Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001)).

Under Ninth Circuit precedent, as reflected in Dark, Plaintiff creates a triable issue as to whether she was a qualified individual.

> 2.   Adverse Employment Actions Taken Because of
>      Plaintiff's Disability

Plaintiff complains that she was reprimanded, through the One-Time Notice, and subsequently terminated because of conduct resulting from her bipolar disorder.

Plaintiff cannot obtain relief based on the One-Time Notice. As noted above, the One-Time Notice advised Plaintiff that she violated Defendant's policies through her conduct in Sacramento and

17

United States District Court
For the Northern District of California

misuse of her corporate credit card.  Communications that merely notify employees of policy violations do not constitute adverse employment actions, even if they are "cited as part of the reason for an employment decision."  McRae v. Dep't of Corr. & Rehab., 142 Cal. App. 4th 377, 392 (2006).  Plaintiff offers no evidence that receiving the One-Time Notice, on its own, materially affected the "terms, conditions, or privileges" of her employment.  Id. at 386 (citation omitted).  Thus, to the extent that Plaintiff's discrimination claim is based on the One-Time Notice, summary judgment is warranted in favor of Defendant.

Plaintiff, however, makes out a prima facie case with regard to the termination of her employment.  Plaintiff contends that the conduct for which she was terminated resulted from her disability.  Conduct "resulting from a disability is considered to be part of the disability . . . ."  Humphrey, 239 F.3d at 1139.  Thus, "where an employee demonstrates a causal link between the disability-produced conduct and the [adverse action], a jury . . . may find that the employee was terminated on the impermissible basis of her disability."  Gambini v. Total Renal Care, Inc., 486 F.3d 1087, 1093 (9th Cir. 2007).[3]

Defendant states that it fired Plaintiff because she abandoned her job and continued to use her corporate credit card for personal purposes.  Plaintiff did not return to work as expected on January 29, 2007 because of her involuntary commitment to a mental health

---

[3] Defendant suggests that Gambini is not instructive because it concerns discrimination claims under Washington state law. However, for the principle on which this Court relies, the Gambini court cited Humphrey, which addresses the ADA.  See Gambini, 486 F.3d at 1093.

**United States District Court**
For the Northern District of California

ward in a London hospital.  Thus, Plaintiff's mental disability caused her failure to return to work, for which Defendant terminated her.  Further, Plaintiff states that the continued misuse of her corporate credit card resulted from her manic condition.  Defendant offers no evidence to the contrary.  Nor does Defendant show that, when she was not suffering a manic episode, Plaintiff made personal purchases on her corporate credit card in violation of company policy.  If a jury draws all inferences in Plaintiff's favor, it could reasonably conclude that Defendant terminated her because of disability-produced conduct and, by extension, her disability.

Defendant defends its firing of Plaintiff by asserting that it fired her "for misconduct unrelated to her disability."  Reply at 9.  It asserts that Hoover, Hill and Bilo did not know that Plaintiff was suffering a manic episode in 2007, citing Cazar's representations that Plaintiff was suffering complications with her pregnancy.  Although Cazar's statements could support an inference that Defendant was ignorant of Plaintiff's actual condition, the record also contains sufficient evidence to suggest that Hoover, Hill and Bilo knew that Plaintiff's bipolar disorder was the driving force behind her purported misconduct.  Indeed, Plaintiff's actions, on their own, were sufficient to alert Defendant that she was suffering a manic episode.  Without warning, Plaintiff abruptly left for London and, before doing so, sent Bilo and others an incoherent, rambling email.  During the same period, Plaintiff made several personal purchases with her corporate credit card, including an $8,859.10 plane ticket to London; the last time Plaintiff misused her corporate credit card was during her previous

19

manic episode.  At her deposition, Hoover agreed that, by January 24, Defendant's management was aware that Plaintiff was experiencing "another bout of bazaar [sic] behavior."  Adams Decl., Ex. 19, Hoover Depo. 128:2-6.  Also, Defendant's response indicated that it suspected that Plaintiff's actions were the result of her disability.  For instance, the IMT case report on the matter referred to her bipolar disorder and "past history of behavior and emergency hospitalizations . . . ."  Adams Decl., Ex. 21 at D000508.  Further, as part of its plan, the IMT asked Lacovara, the psychiatric social worker who had evaluated Plaintiff after her 2003 manic episode, to contact Plaintiff and assess her condition.  Even after Cazar purportedly told Toothill that Plaintiff was doing fine, the IMT persisted with its plan to have Lacovara contact Plaintiff.  Thus, considering all of the circumstances, a jury could reasonably infer that Defendant knew that Plaintiff was suffering a manic episode and terminated her for conduct that resulted from it.

It is true that Plaintiff's disability-related conduct violated Defendant's policies.  Plaintiff does not have "<u>absolute</u> protection from adverse employment actions."  <u>Gambini</u>, 486 F.3d at 1095 (emphasis in original).  As the Ninth Circuit has explained, to defend against a discrimination claim in which an employee's misconduct resulted from a disability, an employer is free to challenge the employee's status as a "qualified individual" or raise affirmative defenses, such as claiming that the accommodation

20

**United States District Court**
For the Northern District of California

1    requested is an undue burden.[4]   Id.

2        Nonetheless, there is a triable issue on whether Defendant

3    fired Plaintiff for conduct caused by her disability, and Plaintiff

4    makes out a prima facie case for disability discrimination.

5        C.   Non-Discriminatory Reason and Evidence of Pretext

6        Once plaintiffs establish a prima facie case, a presumption of

7    discriminatory intent arises.  Guz, 24 Cal. 4th at 355.  To

8    overcome this presumption, defendants must come forward with a

9    legitimate, non-discriminatory reason for the employment decision.

10   Id. at 355-56.  If defendants provide that explanation, the

11   presumption disappears and plaintiffs must satisfy their ultimate

12   burden of persuasion that defendants acted with discriminatory

13   intent.  Id. at 356.

14       To survive summary judgment, plaintiffs must then introduce

15   evidence sufficient to raise a genuine issue of material fact as to

16   whether the reason the employer articulated is a pretext for

17   discrimination.  Morgan v. Regents of Univ. of Cal., 88 Cal. App.

18   4th 52, 68 (2000).  Plaintiffs may rely on the same evidence used

19   to establish a prima facie case or put forth additional evidence.

20   See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir.

21   2000); Wallis v. J.R. Simplot Co., 26 F.3d 885, 892 (9th Cir.

22   1994).  However, "in those cases where the prima facie case

23   consists of no more than the minimum necessary to create a

24   presumption of discrimination under McDonnell Douglas, plaintiff

25   has failed to raise a triable issue of fact."  Wallis, 26 F.3d at

26   _____

27       [4] Notably, in its papers and at the hearing, Defendant never
     claimed that placing Plaintiff on immediate and indefinite leave
28   whenever she suffered a manic episode would have imposed an undue
     burden.

890.

Plaintiffs can provide evidence of "pretext (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1194 (9th Cir. 2003) (citation and internal quotation marks omitted); accord Morgan, 88 Cal. App. 4th at 68.  When plaintiffs present indirect evidence that the proffered explanation is a pretext for discrimination, that evidence "must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate." Morgan, 88 Cal. App. 4th at 69 (citation omitted).  When plaintiffs proffer direct evidence that the defendant's explanation is a pretext for discrimination, "'very little'" evidence is required to avoid summary judgment.  Id. (citation omitted).

Defendant argues that it fired Plaintiff because she abandoned her job and violated the One-Time Notice by using her corporate credit card for personal purchases.  It claims that, based on Cazar's representations, it did not know that her conduct stemmed from her disability.  However, as explained above, adverse actions taken because of conduct resulting from a disability are considered taken because of the disability.  Accordingly, Defendant fails to offer a legitimate, non-discriminatory reason for its action and does not shift the burden to Plaintiff to proffer evidence of pretext.  See Dark, 451 F.3d at 1084.

Nonetheless, Plaintiff has offered specific and substantial

**United States District Court**
For the Northern District of California

evidence that Defendant's reasons were pretext for discriminatory animus.  As noted above, on January 24, the day after he received Plaintiff's rambling email, Bilo called Hoover to say that he wanted to "let her go."  Adams Decl., Ex. 20.  At that time, Plaintiff's absence did not qualify as job abandonment.  Also, there is no evidence that Bilo knew at the time that Plaintiff had used her credit card for personal purposes; the IMT did not investigate Plaintiff's charges until January 30.  Further, after her 2006 episode, Bilo expressed discomfort with continuing to work with Plaintiff and, although he understood that there were "major concerns about the legality" of terminating her employment, he sought advice on what options Defendant had for dealing with Plaintiff.  Adams Decl., Ex. 14.  Bilo's comments, made shortly after Plaintiff's manic episodes, constitute evidence that Defendant's explanation that it discharged Plaintiff for reasons unrelated to her disability was pretext.

Plaintiff also contends that, prior to receiving the One-Time Notice in August, 2006, Defendant had not warned her about personal use of her corporate credit card, even though she had been making personal purchases with it, and reimbursing the company, since 1999.  The timing of Defendant's warning, which occurred contemporaneously with Bilo's concerns about working with Plaintiff and shortly after one of her manic episodes, further supports an inference of pretext.  That Defendant also investigated the activity on Plaintiff's corporate credit card during her 2007 manic episode strengthens this inference.

Accordingly, summary judgment is not warranted on Plaintiff's claim for disability discrimination, to the extent that it is based

on her termination.  However, for the reasons stated above, the Court grants summary judgment in favor of Defendant on Plaintiff's claim insofar as it rests on the One-Time Notice.

II.  Claim for a Failure to Accommodate Disability

Plaintiff alleges that Defendant failed to accommodate her disability by refusing to excuse her from the Sacramento meeting in June, 2006 and denying her extended medical leave during her manic episode in January and February, 2007.

Under California law, the "elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability." Scotch v. Art Inst. of Cal.-Orange County, Inc., 173 Cal. App. 4th 986, 1009-10 (2009).

A claim for a failure to accommodate implicates the duty of an employer to engage in an interactive process with an employee to determine a reasonable accommodation.  As one California court explained,

> Two principles underlie a cause of action for failure to provide a reasonable accommodation.  First, the employee must request an accommodation.  Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith.

Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 54 (2006) (citations omitted).

In most cases, an employer's obligation to initiate the interactive process arises only after an employee makes an initial request.  Brown v. Lucky Stores, Inc. 246 F.3d 1182, 1188 (9th

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Cir. 2001).  However, an exception to this rule applies "when the employer '(1) knows that the employee has a disability, (2) knows, or has reason to know, that the employee is experiencing workplace problems because of the disability, and (3) knows, or has reason to know, that the disability prevents the employee from requesting a reasonable accommodation.'"  Id. (quoting Barnett v. U.S. Air, Inc., 228 F.3d 1105 (9th Cir. 2000)).  In such cases, an employer has a duty to initiate the interactive process to determine a reasonable accommodation, even without a request by the employee.  Brown, 246 F.3d at 1188; cf. Bultemeyer v. Fort Wayne Cmty. Schs., 100 F.3d 1281, 1285 (7th Cir. 1996) ("[I]f it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.").

To the extent Plaintiff's claim is based on the denial of her request to be excused from the Sacramento meeting, it is time-barred.  An aggrieved party must file an administrative complaint with DFEH within "one year from the date upon which the alleged unlawful practice . . . occurred."  Cal. Gov't Code § 12960(d); see also Cucuzza v. City of Santa Clara, 104 Cal. App. 4th 1031, 1041 (2002).  Plaintiff filed her DFEH complaint on or about July 16, 2007, more than one year after Bilo required her to attend.

Summary judgment is not warranted on Plaintiff's claim to the extent that it is based on Defendant's failure to place her on extended leave.  Defendant asserts that it had no duty to accommodate Plaintiff with an extended leave of absence during her 2007 manic episode because she did not request such an accommodation and failed to engage in an interactive process.  However, Plaintiff has created a genuine dispute as to whether the

25

narrow exception outlined in <u>Brown</u> may apply. Defendant knew of Plaintiff's disability and, as explained above, a jury could infer that Defendant either knew, or had reason to know, that Plaintiff's behavior stemmed from her bipolar disorder. As for the third prong, Defendant was aware that, in the past, Plaintiff had been hospitalized for her disability. If viewed in the light most favorable to Plaintiff, this knowledge could support an inference that Defendant had reason to know that a debilitating manic episode prevented her from affirmatively seeking extended leave. Thus, that Plaintiff did not make a request does not immunize Defendant from liability on her failure to accommodate claim.

Finally, Defendant argues that it was not obliged to "waive discipline," forgive Plaintiff's misconduct and hold her position open for an indefinite amount of time. Plaintiff did not make such requests. Instead, she asserts that Defendant should have afforded her extended leave, as it had done in the past. As already noted, Defendant does not contend that granting her this accommodation would have caused it an undue burden.

Accordingly, summary judgment is not justified on Plaintiff's claim for a failure to accommodate her disability.

CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. (Docket No. 21.) Plaintiff's claims for sex discrimination, retaliation, intentional infliction of emotional distress, negligent infliction of emotional distress and violation of California Labor Code § 206 are summarily adjudicated against her. The Court also summarily adjudicates that Plaintiff may not base her claims for disability discrimination and

26

United States District Court

For the Northern District of California

1  a failure to accommodate her disability on the One-Time Notice or

2  on the denial of her request to be excused from the June, 2006

3  meeting.  In all other respects, Defendant's motion is denied.

4      The Court refers the parties to H. Jay Folberg for further

5  mediation.  A final pretrial conference is scheduled for December

6  21, 2010 at 2:00 p.m.  A seven-day trial is scheduled to begin on

7  January 10, 2011 at 8:30 a.m.

8      IT IS SO ORDERED.

9  Dated: 10/12/2010

CLAUDIA WILKEN
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28